My name is Anthony Long and I represent Femina Adelaide who challenges her conviction and sentencing for false statements in violation of section 1001 and conspiracy. I would like to reserve five minutes of my time for rebuttal. This matter arises from the debris of Super Typhoon Pongsana which struck Rota on December 7th, 2002 and as a result of that devastation, for the first time ever, the Disaster Unemployment Assistance Program was extended to the island of Rota. Now, that program had never been administered on Rota and Rota, as well as the commonwealth, does not have any sort of unemployment compensation procedures. So no one, at least on the island of Rota, was familiar with the program, how it works, how the program would proceed. As a result, the United States Department of Labor sent a Ms. Diane Huff to Rota to However, Ms. Huff had not had any experience with the program herself. She had essentially self-taught herself this whole program roughly two weeks before going to Rota and then training Ms. Adelaide for a brief period of time. Mr. Long, how tough can it be to simply understand that when the federal government affords disaster relief payments to victims of a natural disaster, they have to truly be victims of the disaster? Does it really take two weeks to figure that out? Well, yeah, given the nuances of the program and how it works, we think that it's just that plain and simple, well, you know, were you working? Yes or no. Wasn't it really that simple? Were you a fisherman or a farmer, yes or no? If the answer is yes and you can prove that your livelihood was wiped out by the typhoon, you're entitled to benefits. If the answer is no, I wasn't even on the island when the storm hit, I was in Guam, that sounds to be like a materially false application for federal disaster relief. No, that's not necessarily how the program works, Your Honor. For instance, with respect, when you read through the manual, it has nothing to do with whether you lived in a general location at the time a disaster struck. For instance, if the disaster ... So I could put in a claim from Seattle for relief from Hurricane Katrina under your theory? If you were a salesman and you had your business territory involved New Orleans, yes. For instance, if a person lived in Connecticut, a disaster happens in New York, they cannot go to their job and do work in New York, they are eligible because their livelihood has been impacted. One of the victims, the evidence showed, had worked for an airline and had been laid off before the storm hit, and yet she put in a claim for benefits claiming that her livelihood had been wiped out by the storm. Well, what we have was, I believe that was Ms. Nanette Adelaide who stated yes, but also her testimony was that at one time she was planning to go back to work, okay, but she couldn't go back to work because of the disaster. She was an airline employee, she wasn't a fisherman or a farmer. Well, you don't have to be a fisherman or a farmer in order to receive the benefits for doing that. But did the form that she filled out say that she was a fisherman or a farmer? Well, the form she did, yes, all right, and to the extent it said maybe she was a fisher or a farmer, but she was entitled to the benefits nevertheless, that becomes immaterial.  Right, because certainly the person reviewing the form is entitled to review it for whatever it says and not for something else. So if she says she was a fisherman or a farmer and she wasn't, they don't have to go poking around to find out whether she's something else. Oh, that's correct. That's correct. So you take it at face value from that point. So the point is, too, is that you must show, the government must show, if a person came in and said, oh, I was a farmer, and they weren't, they must show that, one, Ms. Adelaide knew the person was not. And we submit that the evidence is lacking on that point as well. What's the population of the island? Excuse me? What's the population of this island? It's roughly 3,000 people. 3,000 people. And it looked to me from the names of witnesses and victims in the case that a number of them were related. That's correct, Your Honor. So why can't a local jury sitting in the Commonwealth of the Northern Mariana Islands, knowing the familial relationships that are discussed in the testimony during the case, conclude that there's a fair amount of knowledge that the defendant would have had, I'll call it local knowledge, about what some of these people did and whether or not these were bona fide claims for disaster victims? Because what we have, Your Honor, we have a system where it's based on what the proof shows, Your Honor. Not what the jury may speculate, Ms. Adelaide may have known what people were doing or may not have known. Well, I'm talking about evidence that I read in the transcript of the trial. I mean, the fact that some of these people were literally nieces and nephews and that, you know, go see auntie and, you know, she'll take care of you. I mean, the jury heard all that, did they not? Well, the jury heard testimony to that extent from some of the individuals. However, Your Honor, that assumes that, one, a person knows what their auntie, that the auntie knows about their life, knows what they do and what they don't do. I think this is starting to sound a little bit like the discussion you and I were having on Monday morning about, you know, making reasonable inferences, circumstantially, from the evidence. But you would agree, would you not, that if we were looking at a Los Angeles County jury verdict in a case like this, we might not cut as much slack as we would for what I will, I think, characterize as a rural jury that certainly, based on the evidence in this record, heard an awful lot about familial relationships as it pertained to what the defendant must have known when she certified that these were valid claims? No. What they heard was that there may have been familial relationship with some of the claimants. However, there was nothing that said what knowledge she possessed concerning those particular relatives. Well, there was, actually, in that her auntie testified, essentially, that Ms. Adleck knew everybody and everything about the island. But whether that's confident testimony is another question. But she did say that. Yeah. I mean, but that's just a broad statement. Everybody knows everything about everybody who lives on the road. That's just a broad statement. But there has to be something to substantiate that, to just go out and make a broad statement and say, okay, that's the proof. We think that's the evidence. Let's go back to my earlier question about the fact that, you know, we've got the one victim who worked for the airline and she submits a claim as a fisherman or a farmer. And the question is, was it reasonable for the jury to conclude that your client knew she wasn't a fisherman or a farmer at the time that she submitted the claim? Well, there was testimony that she did work, that her family had a farm, and that once the, that her in-laws, I believe, had a farm. And that when she wasn't working on the, when she ceased working at the airline, she did perform some services and work on the farm. And as you go through some of the provisions of the Dura Handbook, it talks about, briefly about farm workers and livelihood of farm workers and family members who work on farms. Although it talks about it in the context of, let's say, students, what we're saying by the same token, it has to extrapolate out, because we have to remember, the handbook, yes. Well, let's talk about the student. As I understand, one of the claimants was actually going to college or junior college on Guam, and he had a part-time t-shirt business. No. My understanding is that Mr. Mendiola, he had a business of which he manufactured t-shirts, t-shirts which included... On Guam. On Guam, correct. But he also sold the t-shirts on Rota. Okay, but he puts in a claim saying, I'm a fisherman or a farmer on Rota, and my business has been wiped out. But he didn't say that. If you look at his application, his application states he had a business. Nothing in his application or declaration states he was a fisher or a farmer. I thought that the evidence was that the same mayor's certification was put in all these files. Well, a mayor's certification was, but that's to the opposition, a mayor's certification was immaterial. The individual you're talking about on the t-shirt business, he wrote out his own declaration. Well, why was the mayor's certification immaterial? I mean, presumably she put them in because, as I understand from the record, she understood that people were coming to check, to see, to do an audit, and I presume she was concerned about that. So she went and she got these mayor's certifications made up, or she made them up, and put them into the file. She must have thought they were going to have some impact on something. Well, whether she thought they had impact or not is not the point. The point is whether those are necessary things that impacts on the jurisdiction of the federal agency. Well, they may not be necessary, but they still could have had an impact on the agency if they were legitimate documents. In other words, I presume what she was trying to do was to back up the information that was on the applications, and perhaps they would have had that impact had they been legitimate documents. Well, the impact was that, one, there were affidavits that there were individuals placed in, and in our position it was the application and the affidavits that are the material documents as opposed to a mayor's certification. Because when you go through the testimony of Angie But the material, it doesn't mean necessary. It means something that could have had an impact on the relevant agency. Right. But if you look at what Angie testified, if I recall recollect Angie's testimony, Angie was saying that those certifications from the mayor were placed in the file because of another Commonwealth agency, the Office of Public Auditor, coming to collect the information, so they placed these documents into the file. So, in essence, according to Mangiam and Deola, those documents related to something for the OPA and not to the United States Department of Labor with respect to certification. They weren't coming to collect the documents in order to give them to the United States Department of Labor? Excuse me? They weren't coming to collect the documents in order to comply with some federal law? No, because the way it worked is that Angie would get the documents would go from Roder to the Commonwealth Department of Labor on Saipan and then up to the United States Department of Labor. It did not go to the OPA. It's federal money that's being spent. And is it your legal argument that it is not material that a defendant who is accused under 287 of making false claims against the United States for federal funds and who takes steps to, in essence, thwart an audit of his activity, that that's not material to the federal agency's responsibility to properly distribute the funds to true victims of the disaster? Well, actually, we think that these individuals, they were victims of the disaster itself. Let's put that aside. I'm trying to understand your argument here. What I thought I heard you arguing a few minutes ago was that it can't be material because these are just state auditors who are coming. And if they were misled, then that can't be evidence that relates to materiality of the federal charge. To the extent that they did not relate to the federal Department of Labor, we submit yes, Your Honor, to that extent, yes. But didn't our decision in, I believe it's the InBank decision in Fichini, if I'm pronouncing that correctly, the InBank decision, are you familiar with that case? Yes. Didn't that case turn on whether or not these were actually federal funds that were being disbursed? Yes, it turned on federal funds, but it also turned on whether the federal agency had the power to act, not the federal funds, but whether the agency had the power to act in connection with the false statements of the documents. In that connection, I don't really understand the argument about which federal agency had jurisdiction here. I mean, it seems to me FEMA did anyway because that's where the money was coming from. But leaving that aside, the issue in the OnBank case came up because it has to be a federal agency. But why does it matter whether it's this federal agency or that federal agency? Well, it matters because who has the power to act? But that's not a jurisdictional question. Yes, it is. It goes to the element, an element of the case, an element, an essential element is agency. Let there be a federal agency. And your argument is that it's not this federal agency, it's that federal agency. Correct. But why does that matter? It matters because the agency that has jurisdiction has to be to act. For instance, in U.S. v. White, a 1946 district court case, it basically states that you have to determine out of the differing federal agencies which agency has the power to act. For instance, that dealt with a statement concerning aliens. It was saying you can't say the Department of Interior can come in and then prosecute because it doesn't have the power to act. Here, it was only the Department of Labor that had power to act. The FEMA gave money to the Department of Labor, the Department of Labor gave the money to the Commonwealth, and the Department of Labor was responsible for overseeing the administration and expenditures of those funds. But the only problem, as you describe it then, is one of, it's essentially a problem of the indictment not being precise. That's what you're saying. In other words, if they, in your view, if they had written the same indictment but said Department of Labor, it would have been fine. Well, the indictment said Department of Labor and FEMA. However, at the end of the case, the government made the election only FEMA. So that's the problem. If they hadn't made that election, it would have been fine. So the problem isn't jurisdictional. It's just that they, the way they wrote the instructions is inaccurate. Well, what it goes to is an essential. Excuse me. It's a variance? Is that what you're saying? No, it is not a variance. It goes to a material element. In fact, an essential element that the government must prove which agency possessed the jury, the jurisdiction, the power to act in relation to this matter. How do you read the delegation orders? I read the presidential executive order, and then I read the order of the director of FEMA to the Department of Labor. And it didn't look to me like FEMA was completely washing its hands of any responsibility for the administration of these funds. It looked to me like it was delegating a portion of its authority and that the president had delegated a portion of his authority. And in essence, that everybody still had a responsibility. The president has to declare the disaster. The money is allocated to FEMA. FEMA then gave the money to the Department of Labor to actually distribute. But everybody's still on the hook, so to speak. So getting back to Judge Berzin's question, what difference does it make? Well, if we want to take that approach, then essentially what we can say in every 1,001 case is since all the funds come from the United States Treasury originally, then the Treasury always has jurisdiction. So we don't even have to go into which agencies. We can just say, okay, United States Treasury. That's it. But that's not what the law holds. Can you speak to the question of a factual statement about what the crime is? I mean, just like you have to say so-and-so took money from Ms. Jones in a theft case, in this case you have to say that they made a false statement to X agency. And if you don't prove X agency, then you've got a problem. But it's not a jurisdictional problem. It's simply a factual problem. Correct. Well, it's an element of the case. One of the elements, it calls itself agency jurisdiction is an essential element. That's just how the – it is not a jurisdictional meaning in a court's power to hear it. It's called agency jurisdiction, which is an essential element of the agency's power to act in connection with the statement. So that was the focus of my question this morning, and that is, as I read those orders, the agencies in the chain, starting with the president, are not completely absolving themselves of jurisdiction, as I read those orders. But only labor could act in relation to these false statements here. Well, labor could pay the claims. Labor could pay the claims. But they had to do so under the, if you will, under the oversight of FEMA. Well, no. Which is in turn answerable to the president, and I guess ultimately to Congress, for whether or not the funds were legitimately expended for disasters. Well, actually, Your Honor, within the handbook itself, it states that the states, when the agencies of the states are doing this, they're acting as agents of the secretary of labor. That's exactly what the handbook says, okay? So in essence, these individuals are responding to their principle, which is labor. It doesn't say they're responding to FEMA. Also, to that extent, there's no evidence in record that says, well, if FEMA was aware, FEMA's job is this, FEMA delegate gives the money to labor. Labor then provides it to the states. Labor then oversees everything about the program itself. Now, there is no evidence in record that says, well, because Manette Adelaide made a false statement, then FEMA would withhold giving money to labor to administer it to a program. That's not how it works. FEMA gives the money to labor, and labor administers the program. If they were certain. In that case, how can you explain Judge Munson's comment at sentencing, which is that one of the damages done by your client was to imperil the integrity of the Commonwealth, such that the district judge worried that the next time a super typhoon hits Rhoda, that FEMA may be somewhat reluctant to make any funds available at all, because of the manner in which the funds were administered as a result of this super typhoon? Well, that's not the standard in law, Your Honor. The standard in law is that once there is a major disaster declared, then funds are made available. Now, the fact of how a program may have been established before, I've not seen any statute or anything that says that's a circumstance that's taken into consideration as to whether a major disaster exists. Well, it certainly was the cause of Mr. Brown's firing from FEMA, and as I see what my colleagues in the Fifth Circuit are now dealing with, they're going to have a pretty full docket with cases just like this one. Correct. But then again, if another disaster hit, funds would be made available. Now, how those funds were administered, there might be changes done, but that would not affect funds being made available when a major disaster strikes. That's the point we're making. I have a question. Has 1001 been amended recently with regard to this jurisdictional requirement? On the agency jurisdiction? Yeah. Not since this suit that I'm aware of, Your Honor, basically. The reason I'm asking, and I guess I need to follow this up, is that the copy of 1001 that I have here doesn't have that language. It says, except as otherwise provided in this section, whoever in any manner within the jurisdiction of the executive, legislative, or judicial branch of the government doesn't say, as it used to, within the jurisdiction of any department or agency of the United States. Do you know where that language comes from? No, Your Honor. I am not aware of that aspect. But you're sure that at the time of the trial in this case it was the other? I'm sure that it had to do, my understanding is that with the department or agency, but in this case, Your Honor, we were dealing with a department, which was the Department of Labor, who we submit had the jurisdiction in this case. However, the jury did not determine the Department of Labor had the jurisdiction in this matter. And that's the problem here. And if the court has a question. I have a question. Yes, Your Honor. Was the reason that these applications referred to phishing and firming, that those are the main occupations on RUDA? For individuals who aren't employed by the government, yes. Employed by the government? Yes. I mean, the local government has government agencies there, okay? And for individuals that aren't employed, let's say like Miss Adelaide, Michael Adelaide, I'm talking about the applicants. Oh, the applicants, yes. Most of the major employment of the applicants were for fishers and farmers. And I take it there are service people like the T-shirt salesman. Yeah, I mean, he was coming in. Basically, it's farming and fishing. Farming and fishing, correct. And the typhoon affected those two occupations. Oh, tremendously. And it also affected anyone who was involved in, let's say, the small tourism industry as well. I'm just pondering as to why these people, even if they were not fishers and farmers, would say they were. Right, because that was basic. And also, the announcements that were published out was telling individuals if you were a farmer or a fisher, come in and apply because, you know, of the effect the typhoon had on your livelihood. Sure. Thank you. Okay. Thank you very much. Do you happen to know the answer to my question about 1001, whether it was amended with regard to the department agency issue? I'm afraid I don't, Your Honor. I think that this element was added as a matter of case law. No, it was in the earlier statute. I read the earlier statute, and there seems to have been a change at some point, but I don't know at what point. I'm afraid I can't answer that question, Your Honor. Thank you. Good morning. Timothy Moran from the United States. This is a factually intense case in which the defendant is making primarily sufficiency of the evidence arguments, which one case described as a nearly insurmountable burden for the defendant on appeal. Well, that's not true. We do reverse cases for some. I do want to make a couple of factual matters and make a couple of things clear. There were about 350 applicants for DUA in this program, of which two were denied by the defendant, in fact, two Bangladeshi farmers. And by comparison, I believe Alfred Pangilinan testified that when a later typhoon went through Saipan, about 30 percent of the applicants for DUA were approved. So when it was on Rota, it was over 99 percent, and on Saipan, it was about 30 percent. Was it a different typhoon? I'm sorry? Were the two not voters on Rota? They were not citizens. Oh, well, there you go. I mean, wasn't your theory that the reason she was so generous was because she was contemplating re-election or running for this local Senate? Yes, Your Honor. Our theory was she had three reasons to do it, although it's not an element of the case. One was she enriched herself by becoming eligible for valuable overtime benefits. The second was she enhanced the status of – she made her relatives richer. And third, she was basically funding her contemplated Senate or political campaign for later on. Well, on that issue, there was – the testimony as to that actually was inaccurate because the testimony was that she was planning to run in a special election, but, in fact, the special election hadn't been set yet. Right. Well, it's a little unclear. This is the subject of the prosecutorial misconduct claim, and I'm glad you raised that, Your Honor. Angie testified on direct that, in December 2002, Adlai told Angie that she intended to run for office. I mean, that's sensible because she could have intended to run for office, whether or not the position had already been vacated. Right. For any seat. Well, she could have been planning to run for anything. And, certainly, you don't just step into an election. Typically, a person will – But she also testified that the conviction of – whatever his name was. Ricardo Adlai. Yeah. Had occurred in 2002 and by implication that the seat was vacated by then, and that isn't true. Your Honor, she didn't exactly testify to that. What she testified to was that – Angie Manglonian testified that she didn't know when Ricardo Adlai was – well, actually, I think she testified she believed Ricardo Adlai was convicted in 2002. I think that's – I think Your Honor is correct. She testified as well on redirect that Adlai told her that she intended to run for that seat. And it's not clear whether she means the Senate or whether she means the seat that was vacated by Ricardo Adlai. The government's contention is that it doesn't matter anyway because, certainly, Ricardo Adlai was indicted in 2002 and that regardless of when he was convicted, she certainly could have had the intention of running for political office in December 2002, as witnessed by the fact that later in 2003, she did run. So the defendant's point that it was – the defendant has to prove, first of all, that Angie's statement was a false statement and, at best, it's ambiguous about when the defendant intended to run. The logic says that she certainly intended to run before implementing this plan because it would not make any sense that the plan finishes in August, the election's in October, all of a sudden she decides in August for the very first time, I think I'll run for the seat of my Senate. Logic says she had to have had a plan before that. So the logical inference from what Angie says is that she had the intention in December to run for that seat. So your theory was that when the typhoon came along and this federal money became available, she saw that as an opportunity to aid in her dream. Right, and Angie never says that she knew of a connection between the federal money and the campaign. Now, I obviously argue that inference to the jury. It's my contention that that inference is supported by the facts, but Angie never said she knew of a connection. She said what she'd heard, and I argue that fact, and that's consistent with what she said to the FBI when she said she didn't know of a connection. All she testified to was she was repulled by the defendant, including what the defendant says in November 2003 after she loses the election. She comes in and tells Angie, where were all those people I helped? So that statement certainly supports the logical inference that I argue to the jury, which was, look, the money became available. She certainly contemplated at some point. I mean, she was a fairly high-ranking. She could have helped them without helping them fraudulently. I'm sorry, Your Honor, I didn't. She could have helped them without helping them fraudulently. She could have, Your Honor. That gets a little bit back to what the defendant was arguing before, you know, about the suit of the evidence and the false statement counts. He's trying to say that, look, none of this mattered because they would have been eligible anyway. That's not the test under 1001. That's not the test, but the question is exactly what is the evidence of knowledge here that she knew that these were fraudulent? Six out of seven of the substantive false statements were people who said they were related to her. The seventh was Ryan Manglonia. Ryan Manglonia said he knew her his entire life. Six out of seven, with the exception of Ryan Manglonia, described her as auntie or nina. Nanette Adelig sat there with Fermina Adelig and filled out the form, gave it to Fermina Adelig. Fermina Adelig took white out, crossed out the boxes that would have made her ineligible and put in checks. If you look at page 686 in the excerpt of record, that is one of the exhibits. You can actually see that she didn't wipe things out very well. You can actually see the original marks that Nanette Adelig put in and then that were whited out by Fermina Adelig, and then she checked the other boxes. You can't show knowledge any better than to show that, I mean, Fermina Adelig was the one who changed the statements. Does the form say, or does the handbook say, what does it say about how reliant the individual has to be on whatever their livelihood is? In other words, is part-time reliance good enough? The criteria are two, that you're unemployed and that you be unemployed as a result of the storm and that it be your primary source of income. So, for example, for all of these students, Ryan Manglonia testified that although he did some farming, he made $20 farming and he lived off his parents. Jolene Ramos was a student supported by her parents. Flavin Hokog was a beauty pageant contestant and student on Saipan being supported by her family. She and Jolene Ramos flew back to Rotorua to fill the application. Dextra Mendiola was being supported. He explained that his primary source of income was his parents. That makes you inalienable. Nanette Adelig was the one whose in-laws did some farming, they grew flowers, was the testimony. She was supporting herself at the airport and then at a government job. So the issue, but that's sort of, the defendant is attempting to sort of parse, to do three things. One, he's trying to parse the meaning under the handbook and say, well, this person would have been eligible in any event, when we're focusing on the fact that she relied on and used false statements in the application. Second, he's trying to pick which statement should be true or not by saying, well, it matters, you know, the marriage certification, which the jury said each of which were false statements. Therefore, they found jurisdiction immateriality. Said, well, those don't matter, even though they're clearly, all of them are false. For example, Dextra Mendiola is the one that says he's a farmer fisherman. The application says he's got the tea tree business. Well, they're false. So the contention there is they're not material. Now, as a matter of fact, is it true that they weren't submitted to the Department of Labor but to some state agency? None of these documents went to the Department of Labor. That's not the test. The Green decision of this court said very clearly that false statements do not have to be related back to the federal government. It's also the same thing that was found in the Faschini decision. And Faschini separated two classes of claimants, that all the statements in Faschini were made to the, I think, Oregon Department of Labor, the State Department of Labor. They never went any further than that because it was a state-run program. The Faschini en banc decision said that in the first class, which were decisions that never went past the State Department of Labor and were funded solely with Oregon state funds, and I think it's Oregon. It could be Washington. Those were not statements that could be held liable under 1001. The second class of statements. As a Washington taxpayer, I hope that they were Oregon. I could be wrong on that. I think it's Oregon. In the second class, as a federal taxpayer, the second class of claimants were people who were funded through an Oregon-administered program that was federally funded. But I understood what he was saying here, and I have no idea about the details of this, is that it went to some agency which wasn't the agency that was administering the program. I don't know why it would have, but that was just contention, as I understand it. The program, the documents were never intended to, the defendant actually kept all the documents on ROTA, wouldn't let them go. Alfred Pangilinan, who was the person on SIPAN, said that he tried to get a look at the documents and couldn't get access to them. What had happened was that OPA, which is the state auditor, said it was going to come in and look at them. At that point, they went and stuck in all the. The state auditor could have been operating on behalf of the state agency, which was operating on behalf of giving out the federal government's money, essentially. Yes, and it's important to note that any excess money goes back to the federal government. So they remained federal funds throughout the program. That's how FEMA continued to exercise jurisdiction throughout, because it remained federal money. Another point I want to make about the OPA audit, which has not really been responded to by the defendant, is that she backdated at least four of these substantive account applications. Flavian Holcock, Ryan Manglonia, Dexter Mandiola, and Lorianne Weilbacher were all backdated. So even if you say they should have been eligible, and again, that's not the issue under 1001. The fact is they wouldn't have been eligible, no matter whether or not they were farmers or fishermen, because they didn't make the deadline, which had been extended once. And Alfred Pangolin specifically told Femina Adelig, you cannot accept late applications. If you want to accept late applications, they need to make a special showing of good cause for why they were late. Obviously, she didn't want to have to make a special showing of good cause, because that would have drawn attention to her administration of the program. So she both backdated the applications for that reason, and then also salted the files with the mayor's certificates when she found out later that the auditors were coming to look at them. Yes, and if you look at Ryan Manglonia's application, which starts the exit record at 698, they don't even have a chance, and she testified, she didn't have a chance to fill in all those claimant statements were filled in, and they're almost all verbatim, were filled in after the fact. The claimants never said any of the stuff that they're alleged to have said in their applications. That's another area where it's false. And she explains that she got that language from the defendant, that she wrote it in after the fact, and that she spent, she walks in on a Monday morning, and Femina tells her, they're coming to pick up the files, fix this. And they spend the whole next two or three days filling in mayor's certificates and trying to fix up the applications. She said, I just didn't get to all of them, which is why, if you look at Ryan Manglonia's application, the part at the last page of the application where it says claimant statements is blank, and she says, I just didn't get to that one. So the defendant's defense was, in the heat of battle and trying to get all these claims out, I just didn't have time to dot my I's and cross my T's, and the government's theory was, no, it wasn't that. It wasn't that you didn't have enough time to do it in a timely fashion. You were basically making up corroborating information to make it look like these claims were legitimate when you knew they were not. Correct. And she also argued at the trial court, and this goes to the jurisdiction question, what she argued at the trial court was that FEMA, not U.S. Department of Labor, but that FEMA fell down on the job and didn't train her properly. She argues, and you can see it in the exit records at page 625, the argument was never at the trial court that FEMA did not have jurisdiction. I want to make the point that we're here, the jurisdiction question is the sufficiency of the evidence issue. So the idea of whether FEMA theoretically could have had jurisdiction, really that vote has sailed because that should have been the subject of a motion to dismiss if it were to be made at all. The fact is that what we're arguing the issue now is whether we put forth enough facts to show that FEMA, which really had jurisdiction, whether we proved that point, and we did. Just for curiosity's sake, why didn't you go to the jury on both agencies? Your Honor, I think that's just one of the things that happened at trial. I mean, we only had to prove it in the disjunctive. We did, in the indictment it says, within the jurisdiction of FEMA and USDOL, the indictment, the jury instructions say simply FEMA. I suppose we do think FEMA had, we think we proved both to be honest, but FEMA certainly has jurisdiction because it's their money. And the bottom line is that if this court does find that FEMA was not the right agency, the defendant has already conceded that Department of Labor has jurisdiction. So it really gets down to being a jury instruction issue. The question would be harmless error. Well, it would have to be plain error because he never even objected. Right, because there's no objection. And he can't show plain error because he's already conceded that Department of Labor actually has jurisdiction. So I'm brought to the same question I think Your Honors were asking earlier, which is where's the harm if it, in fact, was DOL? The reality is that it certainly was FEMA. FEMA kept the money, I mean, paid the money, had to pay out more money as more money was required, had authority to take the funds back. So it remained federal money throughout the program. And in addition, it's not a situation simply where once a disaster declares a disaster, you're entitled to DUA. FEMA, not DOL, but FEMA had to come in and make an evaluation. FEMA had to decide to make DUA money available. FEMA sent an agent to the CNMI before Diane Hoff of DOL got there. FEMA approved the application form. FEMA requested that CNMI DOL have checksigning privileges. And FEMA developed the DUA procedures in conjunction with this defendant, not DOL. So it would be inaccurate on this record to say FEMA just said DUA and then walked away and went down to New Orleans. Am I reading those delegation orders correctly? They are not complete divestiture? No. Your Honor is correct. My reading is that FEMA essentially, because of DOL's expertise in unemployment, involves DOL and its administration of the program. But FEMA never relinquishes authority over this program. It remains a FEMA program with FEMA money. Well, that's, I mean, it looked to me like those were very carefully, and I assume that's what agency lawyers do for FEMA and DOL. And I know that's what the White House Counsel does when they draft presidential executive orders. I think that's right, Your Honor. And it's worth noting that all of the cases cited by the defendant that would say that, he doesn't have any cases that say FEMA does not have jurisdiction. He has cases that say that another agency has jurisdiction,  The Supreme Court decision in Rogers is the most on point where it said, a defendant makes false statements in an investigation run by FBI and Secret Service. It's not unusual to have more than one agency involved in the federal government. And the Supreme Court says, look, that's fine. You can have multiple agency jurisdiction. The problem is not too many agency jurisdiction. The problem would be if no agency had jurisdiction, and the defendant plainly concedes that at least DOL has jurisdiction in addition to FEMA. I want to address a few more points on the record with my remaining time. On the merit certifications, again, the materiality question is not whether any federal agency acted on it. The materiality is that it could have affected. The jury clearly found it answered that question specifically because in the verdict form, under the conspiracy count, the jury was asked to specify what was the actual false statement or what was the actual overt act. And the jury simply said the merit certifications were false statements. So the jury clearly had to have found that those were material and that they could have affected an agency's decision. There was a special verdict asking for an answer to that question? The defendant requested a special verdict that would specify with whom the defendant conspired, and the jury said Angie and asked for an overt act. And they specifically said that it was the merit certifications. And materiality as well, if it's not material, the question would then be, why did the defendant insist on putting all of these forms in there? So clearly it was material, and the jury's verdict on that point was supported and rational. I see that my time is up, unless Your Honor has any further questions. Thank you very much for a useful argument. Thank you. Counsel? Thank you. In response on the aspect about the delegation from FEMA to this labor, on page 736 of the excerpt of the record is where they have the jurisdictional responsibilities under the handbook, and basically what it says is that the president delegated to FEMA the responsibility for administering the Stafford Act, and what it says, FEMA has delegated to the Secretary of Labor the responsibility of administering those provisions of the Stafford Act, which pertains. Well, counsel, let's back up. It says, I hereby delegate to the Secretary of Labor, subject to the federal policy guidance and coordination of the director of the Federal Emergency Management Agency. I do not read that language to mean a complete abdication of responsibility for how these funds are going to be administered. Okay. But I'm reading from the handbook that was given, which is at 736, which talks about it was prepared by the Department of Labor, from which was given to you. Well, the handbook does not have the force of law. This is published in the Federal Register. This is a delegation of authority by FEMA to DOL, which is akin to, it has the same effect as an executive order issued by the president. Correct. But obviously this is the understanding that labor has, that it has the full power to administer the DOOR program. Not all parts of that. To the extent that the handbook is inconsistent with the delegation,  Okay. Yes, Your Honor. But in any event, but when you go through the procedure to step forth, if there was any sort of false claims or anything like that, it is labor that has the duty to step in, prosecute. Not FEMA. That's where FECCHINI means by the power to act. FEMA, there is nothing that says FEMA can come in to prosecute. Only labor is what sets forth. So under FECCHINI, as opposition, it's only labor. Now, with respect to Your time is well up. I'll give you one more minute and then wrap up. Yes, Your Honor. With respect to the backdating, on page 842 of the exceptional record, it's clear from the letter from labor that an application was not late unless it was filed after June 14th. The backdating that allegedly occurred concerned applications that were filed in April. And the fact that they said there was no justification given, there was nothing to prove that there was not justification. There were different deadlines, were there not? The deadline was extended at various points? Correct. And the question would be for the jury to decide whether, at the time of whatever the early deadline, the April deadline, whether or not she was backdating before that deadline had been extended. Well, that's what they provided. But the fact is that from labor, it was said that applications could be accepted from April 22nd through June 14th. On page 842. Okay, thank you very much, Mr. Long. I want to thank both of you for coming this distance to argue with us, for us, not with us. And the case of the United States versus Adelaide is submitted, and we are finished for the week. Thank you very much. Just out of curiosity, how long does it take to get from here to Saipan? This isn't bad. This is about six or seven hours to Guam, and then Guam is about a 25-minute flight. Oh, okay. This is as good as it gets. Okay, very good. Thank you. All rise.
judges: Alarcon, Berzon, Tallman